# Appeal of F. H. Powell, Administrator of James H. Davis, deceased.

*Partnership—Equity of partners and creditors.*

The equity of creditors must be worked out through the medium of that of the partners.

*Partnership—Effect of death or transfer.*

In the absence of an agreement a legal dissolution is effected by death of a partner or the transfer of a partnership interest.

*Partnership—Transfer of shares —Liability for pre-existing debts.*

The transfer of a partner's interest or shares in an unincorporated banking association and a continuance of the business without any separation of past from future liabilities, or discrimination between past and future profits will not make the new concern liable for pre-existing indebtedness of the bank. The creditors of the former firm or firms which may have constituted the banking association have no claim attaching to the partnership effects which have passed to the succeeding partnership; the latter firm may sell unhampered by any lien or trust in favor of the creditors of the former firm or assign for the benefit of creditors, and in that case the only persons entitled to participate in the distribution are the creditors of the firm to which the property belonged at the time of the assignment.

*Partnership—Transfer of shares of unincorporated bank.*

The facts that the interests of parties are represented by shares of stock which are transferable like shares of a corporation, and after such transfer the business is conducted as before, without separation or distinction made between past and future liabilities, does not change these rules. The stockholders in such a bank have the rights and responsibilities of, and in their relation to the public and to each other are, general partners.

The mere continuance in business and voluntary payment of certain obligations contracted by the old firm would not, of itself, bind them for all such claims.

*Partnership — Continuing business — Assignment for creditors—What creditors participate.*

The articles of an unincorporated banking association provided for representation of the partner's interests, by shares of stock and for continuation of business without liquidation on transfer of a partner's shares under prescribed conditions, etc., but did not contain any agreement which bound the new firm, created whenever a change of membership occurred, to pay past debts and to indemnify the retiring member against them. *Held*, that upon an assignment for creditors, the creditors entitled to share in the distribution were those who had at the time the assignment was made a clear legal title as creditors of the firm, which was the then owner of the assigned estate, and that creditors of prior firms were relegated against

the individual partners composing the firm at the time their liability was created, which was fixed by the last transfer of all the shares of any one partner whether to a new partner or to another member of the firm. Christy v. Sill, 131 Pa. 492, followed.

Argued May 21, 1896.   Appeal, No. 23, April T., 1897, by F. H. Powell, Administrator of James H. Davis, deceased, from the definitive decree of C. P. Crawford Co., Feb. T., 1894, No. 156, distributing money in the hands of J. W. Smith, assignee for benefit of creditors of the Meadville Savings Bank. Before RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER and ORLADY, JJ.   Decree reversed.

Exceptions to report of Wesley B. Best and Frank J. Thomas, auditors, to make distribution of the balance in the hands of the assignee as shown by partial account.

The auditors' report was, inter alia, as follows:

### FINDING OF FACTS.

1. The Meadville Savings Bank was a copartnership organized in March, A. D. 1867, and was composed of a great number of persons holding shares of the capital stock thereof.

2. That said copartnership was organized under articles of association containing inter alia the following clauses and paragraphs:

" The stock and interest of and in said association shall be held as and in the nature of personal and partnership property only, and shall always be liable and deemed to be hypothecated for any indebtedness or liability of the holder thereof to said association, whether presently due or otherwise; and the said stock shall not be assigned or transferred without the consent of the board of directors; and all the property of and belonging to said association, as well lands and tenements as chattels, rights and credits, shall be held by and in trust for the said association as partnership or associate property and assets, and for partnership or associate purposes. The stock, shares, and interest in said association shall be assignable and transferable only on the books thereof, and with the assent of the board of directors in the presence of the President and the Cashier, and upon such transfer the assignee or assignees of such share or shares shall thereby, as to such share or shares, succeed and

become subject to all the rights and obligations of an original party thereto.

"This association shall continue until it shall be declared to be dissolved by the votes of the holders of a majority of the shares of the stock entitled to representation at a stockholders' meeting called for that purpose, and no general assignment of the assets of said association shall be made except in pursuance of a like vote, nor shall the death of a stockholder be, nor operate as a dissolution of said association, but the shares of such decedent shall thereupon vest in his executors or administrators or devisees of said stock who shall succeed with like effect as provided in the case of a transfer upon the books of the association, except in the case of a minor devisee the stock shall stand in the name of the guardian of such minor. The holders of the stock of this association, either by original subscription, transfer or otherwise, shall by virtue of such subscription, or acceptance of such transfer, be subject to and thereby take upon themselves the several and respective duties and obligations devolved and incumbent upon them as stockholders or directors, as the case may be."

3. The said articles of association originally provided for a capital stock of fifty thousand ($50,000) dollars, divided into five hundred (500) shares of the value of one hundred ($100) dollars each, but by an amendment thereto the 13th day of January, 1867, the capital stock was changed to thirty thousand ($30,000) dollars and three hundred (300) shares of one hundred ($100) dollars each.

4. That under said articles of association the copartnership entered into a general banking business in the city of Meadville, and such business was continued without interruption until the 13th day of January, 1894, at which time the said bank closed its doors, and ceased to do business.

5. That there were numerous transfers of shares of stock of the association, made from time to time, in the manner provided for in the articles of association.

6. That the last new member to enter said copartnership was one Otto A. Stolz, to whom, on January 8, 1892, G. W. Houser transferred, on the books of the copartnership, five (5) shares of stock of the nominal value of five hundred ($500) dollars.

7. That subsequent to that time, on August 2, 1893, H. C.

Beman, who had been a stockholder from January 2, 1877, transferred ten (10) shares of stock, that being the whole amount of his stock, in the manner provided for in the articles of the association, to Cyrus Kitchen, who was an original stockholder, this being the last transfer of stock made.

8. That about the time of this last transfer, H. C. Beman published notice of said transfer in the Meadville Daily Republican, a newspaper published in the city of Meadville, Pa., for several days prior and subsequent to August 22, 1893.

9. That there was no change in the method of doing business, nor of keeping the accounts of said copartnership, by reason of such changes in the partnership, as was effected by the transfer of stock and the change of stockholders.

10. That on January 23, 1894, the said Meadville Savings Bank made an assignment to James W. Smith, Esq., for the benefit of its creditors, in the manner provided for in its articles of association.

11. That in said deed of assignment the party of the first part is "Cyrus Kitchen, for the co-partnership, known as the Meadville Savings Bank, doing a banking business in the City of Meadville, Pa., under the firm name of the Meadville Savings Bank."

12. That the said deed recites that, "at a meeting of the stockholders of the Meadville Savings Bank, held on the call of the President and Cashier, at the rooms of said bank, January 23, 1894, the votes of the holders of a majority of the shares of the stock of said association entitled to representation being present and being voted by the holders thereof, the following resolution was offered and unanimously passed, to wit:

"Whereas, The association of co-partnership known as the Meadville Savings Bank, on account of losses and misfortune, being unable to continue its business, and on the 13th day of January, 1894, having been compelled to close its doors, therefore,

"Resolved, That the said co-partnership or firm go into liquidation, and the better to effectuate that purpose, that the President of said association, Cyrus Kitchen, be authorized and instructed to make a general assignment of all and every of the assets of said association or co-partnership for the benefit of its creditors;" and further, that out of the proceeds of the assigned

property, the said J. W. Smith, assignee, "shall and do pay the creditors of the said co-partnership their respective just demands in full, if there be sufficient assets to satisfy all the just demands of the creditors in full."

13. That at the time the said bank closed its doors, some of the persons, who were at that time stockholders, were creditors of the bank by virtue of holding credit balances or certificates of deposit on said bank.

The remaining sections of the auditors' finding of facts, 14 to 23, were devoted to a classification of the claims presented.

### CONCLUSIONS OF LAW.

The great contention in this case has been, not as to the validity of the claims per se, but as to what claims shall be allowed to participate in this distribution.

On the one hand it is contended that all creditors of the Meadville Savings Bank, without regard to the time when their claims originated, should participate; while on the other hand it is claimed that dissolution occurred from time to time, owing to transfers of stock and changes in the membership, and that each transfer was followed by a new firm or partnership, and moreover that the assignment was made by the firm doing business after the last transfer or dissolution and for the benefit of its creditors, and that no creditors excepting those of this last firm or partnership should participate in this distribution.

As to such contentions, and as to the other matters involved in this case, the auditors are of the opinion, that while the partnership may provide for a continuance of the business upon a transfer of partnership interests, and that the death of a partner shall not operate as a dissolution of the partnership, yet this can mean no more than that such an event shall not involve the winding up of the partnership accounts, nor the withdrawal of any portion of the capital stock from the business and merely provides a ready means whereby the surviving partners, either among themselves or jointly with a newly introduced partner, may form a new partnership.

An assignee of a partnership interest will thus become a partner in a new firm (in case they continue the business), in the conduct of an old business; or he will continue in an old business with his old associates as fellow partners in a new relation, thus constituting a new firm.

A legal dissolution is effected by such death or transfer, and the acts of the partnership thereafter are the acts of a new firm: Campbell v. Floyd et al., 153 Pa. 84; Robinson v. Floyd et al., 159 Pa. 165; Wilcox v. Derickson's Ex'rs, 168 Pa. 331.

The creditors of the several partnerships, which changed with each death of a partner or the transfer of stock and the change of partnership relations, "must establish their rights through the medium of such membership;" and "the equity of the creditors must be worked out through the medium of that of the partners:" Donder v. Stauffer, 1 P. & W. 198; Snodgrass' Appeal, 13 Pa. 471; Baker's Appeal, 21 Pa. 76; Siegel v. Chidsey, 28 Pa. 279; York County Bank's Appeal, 32 Pa. 446; Lefevre's Appeal, 69 Pa. 122; Frow, Jacobs & Co.'s Estate, 73 Pa. 459; Scull's Appeal, 115 Pa. 148; Story's Equity, sec. 1253.

The joint effects belong to the firm and not to the partners thereof, and upon the dissolution of the firm from any cause, the partners have the right to call upon the effects to pay the partnership debts; as had the partners of the Meadville Savings Bank upon the death of any of its members, or the transfer of any of the stock, and the retirement of a member. The remaining partners had absolute control of the partnership assets, and could have compelled their application to the payment of the partnership obligations or could have embarked them in a continuance of the business with new members, or with the old members in their changed relations, as they did in this case; or they might have otherwise disposed of them.

Taylor et al. v. Fields, 4 Ves. Jr. 396; Ex. parte Ruffin, 6 Ves. Jr. 126; Rex et al. v. Lomman, 3 Phila. 287; Story on Partnership, sec. 360; Doner et al. v. Stauffer et al., 1 P. & W. 198; Clark v. Wilson, 19 Pa. 414; Deal v. Bogue, 20 Pa. 228; Baker's Appeal, 21 Pa. 76; Bullitt v. M. E. Church, 26 Pa. 110; York County Bank's Appeal, 32 Pa. 446; Clark's Appeal, 107 Pa. 436; Christy v. Sill, 131 Pa. 492.

It is contended in this case that, by the terms of the articles of association the rights of the creditors passed with the assets of the bank upon each and every transfer of stock, and that the claimants whose claims arose prior to the last or other transfers stand in the same relation, and have the same rights, as creditors who became such exclusively after the last transfer or change in the partnership interests.

The clause in the articles chiefly relied upon to sustain this position is as follows : " The stock, shares and interest in said association shall be assignable and transferable only on the books thereof and with the assent of the Board of Directors, in the presence of the President and Cashier, and upon such transfer the assignee or assignees of such share or shares shall thereby, as to such share or shares, succeed and become subject to all the rights and obligations of an original party thereto."

It is claimed that by virtue of the above, each and every assignee of shares of stock assumed the obligations and acquired the rights of his vendor from the date when the bank began business in 1867, and took the place of his vendor, as to all transactions in said partnership, prior as well as subsequent to the transfer.

We do not believe the language of the articles of association warrants any such interpretation. It seems quite clear to the auditors that said clause, read in connection with the rest of the article, should be interpreted as a part of the provisions therein, not only for conducting the business, but for preventing a winding up of the affairs of the bank or a withdrawal of any of its capital upon a transfer of partnership interests; and that the foregoing is a clause inserted for the purpose of providing for the partnership agreement or articles of the firm that continues the business after the transfer, and means that the assignee of said shares " succeeds and becomes subject to all the rights and obligations " from that date only that he would under like circumstances as a party or subscriber to the original articles. In other words, that the articles shall bind the partnership beginning with that date to the same extent and in the same manner as if they were original articles of association, entered into by the new partnership on the date when it originated, i. e., on the date of transfer.

And, even if the articles do not warrant such an interpretation, and if they could fairly be interpreted (which we think they cannot) to mean that the assignee or assignees of such share or shares acquires the pre-existing as well as present and future rights and assumes the pre-existing as well as present and future obligations of his vendor, it is no more than a personal contract or obligation between the vendor and vendee of such shares, and can in no way be twisted into or interpreted as a

contract of the new firm or partnership, as such. And an agreement or covenant on the part of remaining partners, or an incoming partner upon the assignment of a partnership interest, to pay the debts of a former firm or to assume the obligations of a retiring partner is a mere personal contract and creates no more than a joint and several or a personal obligation; and when they proceed with the conduct of the business after such a ·change, without the contract of the new firm, as a firm, to so assume the obligations, the creditors of the former firm have no equity attaching to the partnership effects of said firm which have passed to the succeeding partnership even though they remain in specie: Ex parte Ruffin, 6 Ves. Jr. 119; Baker's Appeal, 21 Pa. 76; Bullitt et al. v. M. E. Church, 26 Pa. 108; York County Bank's Appeal, 32 Pa. 446; Babcock v. Stewart, 58 Pa. 179, and the remarks thereon in Shamburg v. Ruggles, 83 Pa. 148; Frow, Jacobs & Co.'s Estate, 73 Pa. 465; 1 Bates on Partnership, sec. 551; Story on Partnership, secs. 358 and 359.

It is contended that this is not an equitable and just theory. That " a considerable part of this money comes from the sale of the bank building and lot. The oldest depositor ought to have the better claim on that if there be any distinction. The seller of stock did not intend that all the assets were turned over to the new concern, and they assumed no liability for existing debts." The theory may be just and equitable in individual cases, and the auditors would find much pleasure in so applying ˈ it in this case as to cause the burdens to be equitably borne; but it is so at variance with the well settled principles of our law that we see no clear way so to do. If the seller of the stock did not intend to turn over the assets to the new firm, he certainly had it in his power to refrain from doing so. But in case of sale, the vendor received his price and such personal responsibility, covenant or agreement from his vendee as satisfied him, and thereupon he turned over his interests. We fail to see by what process of reasoning it can be maintained that he reserved any rights in said assets or did not turn over his interest therein in toto to his vendee. As to the " new concern " assuming no liability for existing debts, how could the vendor expect it to, as he had no dealings with and made no contracts with the " new concern ? " This is where the pinch in the case comes in. If

the retiring partner had desired or expected to hold the new firm responsible and thus compel the application of the assets thereof to the payment of pre-existing debts, he could have and should have made his contract with the "new concern" and not taken the personal agreement or contract of his vendee, whom we may assume he considered amply able and personally responsible to meet his engagements in this respect.   Nor do we see any reason either in law or in equity, why one depositor has any better claim upon the proceeds of the sale of the bank building, by virtue of the character of the property, than another.   None of the claims is of such a character as ever gave the creditor a lien upon the real estate of the partnership.   They are all claims in which the creditor could rely upon nothing but the individual liability of the partners composing the firm with which he dealt.   The partners were at liberty to dispose of any or all the assets, whether of a real or personal character, and no lien attached to or passed with them.

The creditors secured an interest in the same only when the partners assigned the same for the benefit of their creditors, and no creditor could possibly derive any interest therein then excepting those of the firm which assigned.

It is further claimed in this case, that when there was a change in the partnership by transfer of partnership interests, that the new firm took all the assets of the bank and of the former partnership as a trust for the creditors of said former partnership.   We are unable to find any authority for this in the articles of association, and the law is expressly declared to be to the contrary: Baker's Appeal, 21 Pa. 76 ; Lefevre's Appeal, 69 Pa. 122.

The assets of the bank belonged to the last partnership, or the one which conducted the business from the time Cyrus Kitchen purchased the stock of H. C. Beman, to wit, on and after August 2, 1893, until they made the assignment for the benefit of their creditors in January, 1894.   The deed of assignment very clearly shows that the assignment was made for the benefit of this last firm.   It recites that "at a meeting of the stockholders of the Meadville Savings Bank, held on the call of the President and Cashier at the rooms of the said bank, January 23, 1894, the votes of the holders of the majority of the shares of the stock of said association entitled to representation

being present and voted by the holders thereof," the resolution was adopted in pursuance of which the assignment was made. It also provides that out of the proceeds of the assigned property the said James W. Smith, assignee, " shall and do pay the creditors of the said copartnership their respective just demands in full, if there shall be sufficient assets to satisfy all the just demands of the creditors in full."

No person who had sold his shares of stock was entitled to representation at the above recited meeting. Only those who still held shares (or those persons of whom the partnership was composed after August 2, 1893), were so entitled, and by those alone was the assignment made, and for the benefit of their creditors. And inasmuch as this last firm had not contracted, as a firm, to pay any of the debts of a former partnership, they owned and controlled all of the assets, and when they made the assignment for the benefit of their creditors the lien of the several creditors of this last firm attached to said assets in proportion to their several claims at the date of said assignment; and such amounts cannot be increased or diminished from that sum by securing judgments thereon nor by any other acts of the parties subsequent to said assignment. All interest bearing obligations ceased to bear interest on the date of the assignment, to wit, January 23, 1894: Miller's App., 35 Pa. 481; Patten's App., 45 Pa. 151; Brough's Est., 71 Pa. 460; Graeff's App., 79 Pa. 146; Dean & Son's App., 98 Pa. 101; Appeal of Jordan & Porter, 107 Pa. 75; Christy v. Sill, 131 Pa. 492, and the case therein cited; Jamison's Est., Boyer's App., 163 Pa. 143.

As to the judgments offered, as against the Meadville Savings Bank, the auditors having found that there were divers and succeeding firms which conducted the banking business under that name, and no evidence having been offered to prove which of said firms the several judgments are against, the auditors feel warranted in assuming that each is against the firm in existence and doing business at the time the claim upon which the judgment is based arose. And consequently, as well as for the reasons above set forth, the said judgments are not conclusive against the Meadville Savings Bank which made the assignment in this case.

If by dealings on or after the last change of partnership in-

terests, to wit, August 2, 1893, the claim of creditors who held a credit balance in the bank at that time has been changed, they can only participate to an extent equal to the new credits created subsequently thereto, and all payments made after such change must be applied in discharge of said new indebtedness : Christy v. Sill, 131 Pa. 492; Robinson v. Floyd et al., 159 Pa. 165.

As to the objection to the right of certain certificates of deposit to participate in this distribution, on the grounds that they are renewals by the new firm for the former firm's debts, it is certainly true that the payment of interest by the new or last firm on the former firm's obligations, if they should have done so, was not sufficient of itself to charge the last firm with the debt: Shamburg v. Ruggles, 83 Pa. 148; Christy v. Sill, 131 Pa. 492; Campbell v. Floyd, 153 Pa. 84. Taking into consideration the nature of the business they were conducting and the manner in which it was conducted, with the necessity therefor, when the new firm gave its obligations for the former firms' debts, if they did so, they were doing just what, as between the partners, there was no equity to forbid. And if it was not a fraud upon the partners, it is not on their creditors : Siegel v. Chidsey, 28 Pa. 279. It would thus become a valid claim against the new firm. But, from the evidence presented, the auditors cannot find, however, and have not found as a matter of fact that any of the certificates of deposit issued by the last firm were renewals, or given for the debts of former firms. The books offered in evidence simply show that some of said certificates objected to were issued to persons of the same name and for like or exact amounts due and possibly paid the date of the new issue or thereabouts. But the auditors at have no means of determining whether the new certificates are for new debts or are new obligations given for old ones, and neither the bank books nor any other evidence offered before us shows this. Furthermore, all of the certificates objected to extend the time when the debt shall become due and payable (if they are renewals), and are the obligations of the last firm, issued by their duly constituted authorities for debts they had a right to assume, and thereby did assume, provided they were, as contended, the former firm's debts. In any event, all such are entitled to participate in this distribution. And even if

said certificate holders had the additional or collateral security obtained by virtue of the old firm's responsibility to them, or that of the individual members thereof, they are entitled to participate to the extent of their claims against the new firm at the time it assigned: Morris v. Olwine, 22 Pa. 441; Patten's App., 45 Pa. 151; Brough's Est., 71 Pa. 460; Graeff's App., 79 Pa. 146.

Because the equities of the creditors must be worked out through the medium of the partners, and because H. C. Beman was not a partner in the last firm and was not included in the firm that made the assignment, his claim on the certificate of deposit issued to him by said firm for one thousand (1,000) dollars, dated November 4, 1893, must be allowed to participate. But no person who was a stockholder in the last firm can in any event participate in this distribution.

As to the claim of Kitchen & Dick, trustees, the auditors conclude that the respective rights of said trustees either as individuals or in their representative capacity cannot be determined or passed upon in this proceeding, and that a dividend must be awarded them on such amount as was deposited by them with the new firm, less any withdrawals made during the same period.

As to the claim of Francis Theuret and that portion of the bill of the Tribune-Republican which was for publishing the advertisement of the said bank in 1892, in the opinion of the auditors, they occupy no different relation to the last copartnership making the assignment, than any other claim, and having accrued prior to August 2, 1893, the date of the last change in said partnership, they cannot participate in this distribution.

It has been contended, that even if there was a new partnership created by a sale of stock and a change of partnership interests, that such an event could occur only on the introduction of a new member, and that the transfer of the stock of A. C. Beman to Cyrus Kitchen would not effect such a change, as no new obligations were undertaken but simply the entire business was turned over to old partners, each of whom was individually liable for all debts created before and after the transfer, and that if a new firm were created the last one was so created only upon the last transfer which introduced a new member, to wit, on January 8, 1892, when G. W. Houser transferred five (5) shares of stock to Otto A. Stolz, and that if not

all creditors, at least all who became such on and after that date, should participate in this fund.

As to this contention, it is only necessary to observe the principles applicable upon such a transfer. The remaining partners, at the time of the transfer to Kitchen, had the same right to have the assets of the partnership applied to the firm's debts as if a new member were being introduced. They had a right to object to proceedings in the business with Kitchen as a member with this extra amount of stock, or they had a right to proceed with the business with Kitchen as a partner bearing a different relation, as to his relative responsibility at least, from what he previously bore. All these rights being the same as they are when the stock is sold to a person not formerly a stockholder, the effect upon the firm was the same and a new one was created upon that transfer and the fund must be distributed to those claims that arose on and subsequent to August 2, 1893.

Distribution is therefore made according to the schedule herewith presented and marked "Schedule A."

At the request of interested parties, who maintain that all claims should participate, a second schedule of distribution has been prepared, and, if the court should be of the opinion that the auditors have erred and that all claims presented, without regard to whether they arose prior or subsequent to the last transfer of partnership interests should participate, then and in that case, the distribution would be made according to the schedule herewith presented and marked "Schedule B."

AUDITORS' SUPPLEMENTAL REPORT.

*Sur Exceptions to Report.*

And now, December 2, 1895, the auditors make the following report upon the exceptions filed before them in the above stated case.

As to the first exception, to wit: "The auditors erred in not finding the following facts, in addition to the facts stated in the 9th paragraph of findings, viz: No new books were opened and no settlement of accounts between the partners was had at any time by reason of any transfer of shares of stock. The partnership was treated as a unit from the beginning to the end of the business. All claims presented for payment were paid out

of cash on hand, and so the assets of the firm existing after transfer of shares were used to pay liabilities existing before such transfer equally with those incurred after such transfer.

"Most of the certificates of deposit issued by the bank were made payable one year after date, and all certificates given before any transfer of shares, but maturing after such transfer presented for payment were paid at maturity on demand, either in cash or by a new certificate on surrender of the old. There was no separation of past from future assets or liabilities on the occasion of any transfer of stock. Every incoming stockholder must have known that the bank was paying all demands without reference to the dates of deposit, for only by so doing could the bank continue in business."

After consideration of the additional testimony taken on the exceptions, which testimony is hereto attached, the auditors find that upon a transfer of stock or change in partnership interests no new books were opened nor were the accounts between the partners settled; that the business was conducted as before and there was no separation or distinction made between past and future liabilities or assets on the occasion of any transfer, and that the assets or moneys of the bank were used in discharging old obligations or in making new loans, without any reference to the transfer of stock and without regard to the time when liabilities so made were incurred; and that it was the custom of the bank to issue time certificates payable, generally, in one year from date, and when the same became due, to pay them either in cash or by new certificates on the surrender of the old one, making no distinction between past and future assets or liabilities on the occasion of any transfer of stock.

The first exception is, therefore, sustained to the extent and in the manner above set forth, and as to anything further therein contained it is overruled.

As to the second exception, to wit: "The auditors erred in not finding that by the articles of association and the nature and necessity of the banking business, and the practice of this bank, the new firm after each transfer did assume all the liabilities of the preceding firms, and that therefore all depositors were the creditors of the last firm—as between the stockholders themselves—and therefore all were entitled to participate in the distribution," the auditors have not been persuaded that

their construction of the articles of association in their original opinion is erroneous.

There is no evidence before the auditors that would warrant them in finding that after a transfer of stock the new firm assumed all the liabilities of the preceding firms, and the testimony of the two stockholders and partners which had been taken on these exceptions does not show this to be true. It simply shows that the weekly or monthly balance sheet of the cashier of the bank, showing liabilities to the extent of $125,000 or $130,000, and assets in some form to balance the same, which assets were possibly declared to be wholly inadequate to meet the liabilities, were presented to the partners when they met, January 23, 1894, to consider the matter of making an assignment, and that these two partners thought they were about to make an assignment for the benefit of all creditors who had any claims against the bank, without regard to the time when they arose.

All such testimony is wholly incompetent to contradict or controvert the actual thing done by the partners at that time, which was to pass the following resolution, to wit: that appearing in the minutes of the meeting of the stockholders held January 23, 1894, a copy of which is as follows:

"Pursuant to notice, the stockholders met and organized by electing Cyrus Kitchen president. Stockholders present, Cyrus Kitchen, F. P. Ray, A. Blum, W. J. Patten, Otto A. Stolz, Alfred G. Church, W. R. McCoy, and A. W. Mumford, by proxy in person of Hugh Mumford. By request of the president, F. P. Ray made the announcement that this bank was obliged to close its doors on the 13th of January, 1894, and he offered the following resolution at a meeting of the stockholders of the Meadville Savings Bank, held on the call of the president and cashier, at the rooms of the said bank, January 23, 1894, the votes of the holders of a majority of the shares of the stock of said association entitled to representation being present and voted by the holders thereof; the following resolution was offered and unanimously passed, to wit:

"Whereas, The association or copartnership known as the Meadville Savings Bank, on account of losses and misfortunes being unable to continue its business, and on the 13th day of

January, A. D. 1894, having been compelled to close its doors, therefore

" Resolved, That the said co-partnership or firm go into liquidation, and the better to effect that purpose that the president of said association, Cyrus Kitchen, Esq., be authorized and instructed to make a general assignment of all and every of the assets of said association or co-partnership for the benefit of its creditors ; and that Jas. W. Smith, Esq., be the assignee.

" The following shares were voted : A. G. Church, 20 shares; Otto A. Stolz, 5 shares; F. P. Ray, 17 shares ; A. Blum & Son, 2 shares ; W. R. McCoy, 8 shares; W. J. Patton, 7 shares ; Meadville Savings Bank, 81 shares voted by A. Blum, as per resolution passed at directors' meeting held this day; A. W. Mumford, 10 shares, by proxy, Hugh Mumford ; Cyrus Kitchen, 60 shares ; total 210 shares.

" W. R. McCoy, Secretary."

And in pursuance and by virtue of which the assignment in this case was made.

There is nothing before the auditors to show in any way that prior debts had been assumed by the last firm, as a firm, either prior to or at this meeting of January 23, 1894, and whatever the opinion of some of the partners as to the legal meaning of their act, the best evidence of said acts and the meaning thereof, and the only legal evidence of the same was the culmination thereof in the resolution by them adopted, and the deed of assignment itself made in pursuance thereof. And, moreover, we have at least one of their copartners demanding that this distribution be made in actual accordance with the deed of assignment and said resolution and the law regulating such partnerships.

There is not only no testimony that anything was done at this meeting to bind the firm for prior liabilities, but the positive testimony of one of the two stockholders who testified is that nothing was said at that meeting regarding the liabilities created prior to the last change or those created subsequent to said change. The evidence would seem to indicate that the legal liabilities of the firm were either not known or were not discussed.

For the foregoing reasons the second exception is overruled.

As to the third exception, to wit : " The auditors erred in

not reporting in favor of an equal pro rata distribution to all the creditors as stated in schedule 'B' attached to their report," the auditors do not find anything in the additional facts as developed by the testimony on these exceptions to change their opinion as to the method of distribution. The fact that the partnership succeeding in the business upon a transfer continued the business as it was formerly conducted and paid obligations contracted by the old firms was not such an act as to bind them for all such claims, without their contracting or agreeing to be so bound, as a firm. They were no more bound to pay former firms' debts than were the creditors of such firms bound to look to them for payment thereof.

We can well understand how it was necessary for them so to do as a matter of policy, and if they wished to retain the confidence and patronage of the public, and they certainly had the right to do so; but it can scarcely be contended that because they paid some debts or obligations that they could not have been legally compelled to, that consequently and by virtue of so doing they can never cease or refrain from paying like debts, and that by such action they have assumed all debts of a similar character.

Making voluntary contributions of the funds to a part of the creditors of the former firm or firms would not be sufficient to compel contributions to persons of the same class.

The third exception is, therefore, overruled.

As to the exceptions filed by J. P. Colter, attorney, before the auditors, November 30, 1895, the auditors would report as follows:

That the first three exceptions thereof are the same as the ones above set forth and disposed of, and are, therefore, disposed of accordingly.

As to the fourth of said exceptions filed by J. P. Colter, attorney, which is as follows, to wit: "The fees charged by the auditors for their services are excessive and illegal, and at least twice as much as should be allowed," the auditors would say that the claims filed to participate in this distribution amounted to nearly $122,000. There were over six hundred claims presented to participate in said fund. The legal questions raised before the auditors were numerous, exceedingly difficult and many of them unusual, and necessitated a great amount of labor. The difficulty and delay in securing the claims, the

labor and time spent to determine the legal mode of distribution, with the tedious and laborious task of making the actual distributions with their vast computations, occupied the time and attention of the auditors to the exclusion of nearly all other matters for so long a time that the auditors believe that their fees charged are just and legal and in no way excessive, and no more than a fair recompense for the services necessarily rendered, and do not exceed the charges made and allowed under similar circumstances. The exception is therefore overruled.

## SCHEDULE "A."

| | | |
|---|---|---|
| Amount for distribution . . . | | $18,948.27 |
| From which is deducted cost of audit as follows: | | |
| Tribune-Republican . . . . | $ 3.50 | |
| Meadville Messenger . . . . | 6.00 | |
| Meadville Messenger, stationery . | 1.25 | |
| Postage and stationary, use of auditor . | 5.75 | |
| Pro. Slocum, list of liens . . . | 2.80 | |
| Pro. Slocum on this . . . . | 18.17 | |
| Auditors' fees . . . . . | 2,000.00 | |
| | | $ 2,037.47 |
| Balance for distribution . . . . | | $16,910.80 |

Rate of distribution, which is allowed as appears from the following (Schedule " A") .312

| Name. | Date. | No. Certif. | Amt. | Interest. | Div. |
|---|---|---|---|---|---|
| James H. Davis<br>* * * | Aug. 8, '93 | 22,757 | $250.00 | $3.43 | $79.07 |

## SCHEDULE "B."

| | | |
|---|---|---|
| Amount for distribution . . . . | | $18,948.27 |
| From which is deducted costs of audit as follows: | | |
| Tribune-Republican . . . | $ 3.50 | |
| Democratic Messenger . . . . | 6.00 | |
| Democratic Messenger . . . | 1.25 | |
| Postage, etc., use of auditor . . . | 5.75 | |
| Pro. Slocum . . . . . | 25.12 | |
| Auditors' fees . . . . . | 2,000.00 | |
| | | $ 2,041.62 |
| Balance for distribution . . . | | $16,906.65 |

Rate of distribution .1392, which is allowed to claim as follows:

Inter alia.

| Name. | Date. | No. Certf. | Amt. | Int. 3 per c. | Total. | Div. |
|-------|-------|-----------|------|---------------|--------|------|
| Jas. H. Davis | Aug. 8, '93 | 22,757 | $250.00 | $3.43 | $253.43 | $35.26 |
| * * * | | | | | | |

The court below, CRISWELL, J., of the 28th judicial district, specially presiding, in an opinion filed, sustained the exceptions to the auditors' distribution and entered the following decree, holding, inter alia, as follows:

*    *    *    *    *    *    *    *    *

The articles provide for carrying on a banking business, receiving deposits, etc., for the transfer of shares in the association and for the death of members therein, and for a continuation of the business conducted by it, in like manner as if it were vested with corporate powers, and from the testimony it appears that the business was so conducted.   They provide that the title to all property of the association shall be held by the president thereof in trust for the association; that stock, shares and interest in the association shall be transferable on the books thereof with the assent of the board of directors and that upon such transfer the assignee or assignees of such share or shares shall thereby, as to such share or shares. succeed and become subject to all the rights and obligations of an original party thereto; that the holders of stock of this association, either by original subscription, transfer or otherwise, shall, by virtue of such subscription, or acceptance of such transfer, be subject to take upon themselves the several and respective duties and obligations devolved and incumbent upon them as such stockholders.

These provisions were evidently intended to modify and change the rights and liabilities of the partners as the same were fixed by the common law, and if the intention to do so be clearly expressed and the modifications and changes be not unlawful they should be given effect according to their true intent and meaning.   That such parties may, to a certain extent, by agreement, change the relations which would arise between them, by virtue of the provisions of the common law, is not open to question.

*    *    *    *    *    *    *    *    *

### DECREE.

And now, March 18, 1896, the exception relating to compensation claimed by the auditors for their services is dismissed, and those relating to the method of distribution of the fund in the hands of the assignee are sustained, and it is ordered that the schedule of distribution to creditors marked " B " be substituted for that recommended by the auditors, marked " A," and that as so amended the report of the auditors be confirmed and that distribution be made to creditors as provided in said schedule " B." [1]

*Errors assigned* were, (1) in entering the decree, reciting same.

2. In not sustaining and confirming the auditors' report and the distribution made by them as set forth in schedule A.

3. In not confirming the distribution as made by the auditors according to schedule A of their report.

4. In decreeing that all the creditors have claims against the Meadville Savings Bank whether prior to August 2, 1894, and subsequent thereto, were entitled equally to participate in the distribution of moneys in the hands of the assignee.

5. In not sustaining the finding of the auditors that a new copartnership was formed on August 2, 1893, when the stock of H. C. Beman was transferred to Cyrus Kitchen.

6. In not sustaining the finding of the auditors that a new copartnership was formed on January 8, 1892, when G. W. Houser transferred to one Otto A. Stolz five shares of stock.

7. In not sustaining the finding of the auditors that a new copartnership was formed on January 8, 1892, when Otto A. Stolz became a copartner of the Meadville Savings Bank.

8. In not finding as matter of law that upon each transfer of stock a new copartnership was formed.

9. In sustaining the exception to the auditors' report that upon a sale and transfer of shares of stock to a new partner and purchaser that such purchase, transfer and ratification thereof on the books of the company did not work a dissolution of the old, and form a new copartnership.

10. In not finding as matter of law that the sale and transfer on the books of the corporation of the shares of stock, so called, of the Meadville Savings Bank, from a copartner to a new or

another partner worked a dissolution of the old copartnership and created thereupon a new copartnership.

11. In sustaining the exception to the auditors' report that a new copartnership was not formed in each and every transfer of stock of the Meadville Savings Bank and a new copartnership formed at the time of such transfer and acceptance on the books of the copartnership.

12. In sustaining the exception that the moneys in the hands of the assignee as distributed by the auditors was not the money of the copartnership formed after the 2d day of August, 1893, and distributable to the creditors of the copartnership as it existed at the time of assignment.

13. In sustaining the exception that all creditors of the Meadville Savings Bank of the accounts and certificate whether issued prior or subsequent to the 2d day of August, 1893, were entitled to participate in the distribution of the moneys in the hands of the assignee, J. W. Smith, of the Meadville Savings Bank.

14. In sustaining the second exception filed on behalf of W. W. Strickland and others, by Geo. F. Davenport, Esq., J. P. Colter, Esq., J. W. Smith, Esq., and others, which was as follows:

Second. The auditors erred in not finding that by the articles of association and the nature and necessity of the banking business and the practice of this bank the new firm after each transfer did assume all the liabilities of the preceding firm, and that therefore all depositors were the creditors of the last firm as between the stockholders themselves, and therefore all were entitled to participate in the distribution.

15. In sustaining the third exception filed on behalf of W. W. Strickland aforesaid, which was as follows:

Third. The auditors erred in not reporting in favor of an equal pro rata distribution to all the creditors as stated in schedule B attached to their report.

16. In sustaining the first exception filed on behalf of T. H. Apple, collector, by J. W. Smith, Esq., which exception is as follows:

First. The auditors erred in not allowing him to participate in the distribution on the entire balance of $790.30, being his credit balance January 13, 1894; for the reason that the same was all deposited after the 2d day of August, 1893. His credit

balance on August 2, 1893, was $670.47 but on the 1st day of December, 1893, his account was overdrawn $132.90.

17. In sustaining the second exception filed on behalf of said T. H. Apple, collector, which exception was as follows :

Second. The auditors erred in allowing only the difference between the balance as shown January 13, 1894, and the balance as shown by the books August 2, 1893, in this and many other cases wherein accounts were either all withdrawn or reduced below the balance upon August 2, 1893, by payments made by the bank thereafter.

*Thomas Roddy* and *G. H. Haskins*, of *Haskins & McClintock*, for appellant.

*James P. Colter*, *Samuel S. Mehard*, with them *James W. Smith*, for appellee.

OPINION BY RICE, P. J., November 16, 1896 :

In the year 1867, a number of persons organized a partnership association, under the name of the Meadville Savings Bank, for the purpose of dealing in exchange, bills, notes and other securities, and carrying on a general banking business. Somewhat later, articles of association were prepared and signed, wherein it was provided that the capital stock of $50,000 (afterwards reduced to $30,000) should be divided into shares of $100 each ; that such shares should be always deemed hypothecated for any indebtedness or liability of the holder to the partnership ; that the stock should not be assigned, save on the books of the association, and then not without the consent of the directors, of whom there should be nine, to be elected annually ; that upon such transfer the assignee should " succeed and become subject to all the rights and obligations of an original party thereto ; " that the death of a stockholder should not dissolve the association, which should continue to exist until dissolved by a vote of the majority of the holders of the shares of stock entitled to representation, to be cast at a meeting called to specially consider the matter of dissolution; that the holders of stock by original subscription, transfer or otherwise, should, by virtue of such subscription or acceptance of such transfer, be subject to, and thereby take upon themselves, the several

and respective duties and obligations devolved and incumbent upon them as stockholders or directors; that the legal title to all the property of the association should be held by the president of the board of directors, as trustee; that the executive functions pertaining to the business and property of the association should vest in the president; and that the board should appoint a cashier and such other officers and agents as they might deem necessary. There were also careful provisions as to the election of directors and president, the duties of officers, the declaring of dividends and other matters.

The Meadville Savings Bank continued in business until January 13, 1894, when it closed its doors. Ten days afterwards, owing to insolvency, it made an assignment of all the partnership assets for the benefit of its creditors. During its continuance, transfers of its shares were made from time to time to persons not original subscribers; the last new member admitted to the firm being one Otto A. Stoltz, who purchased and had transferred to himself five shares, on January 8, 1892. On August 2, 1893, H. C. Beman transferred ten shares to Cyrus Kitchen, an original partner. The learned auditors have found: "That upon a transfer of stock or change in partnership interests no new books were opened nor were the accounts between the partners settled; that the business was conducted as before and there was no separation or distinction made between past and future liabilities or assets on the occasion of any transfer, and that the assets or moneys of the bank were used in discharging old obligations or in making new loans, without any reference to the transfer of stock and without regard to the time when liabilities so made were incurred; and that it was the custom of the bank to issue time certificates payable, generally, in one year from date, and when the same became due, to pay them either in cash or by new certificates, on the surrender of the old one, making no distinction between past and future assets or liabilities on the occasion of any transfer of stock."

In this respect the facts of the case in hand resemble those of Christy v. Sill, 131 Pa. 492.

The language of the resolution authorizing the assignment is as follows:

"Whereas, The association or copartnership known as the Meadville Savings Bank, on account of losses and misfortunes,

being unable to continue its business, and on the 13th day of January, A. D. 1894, having been compelled to close its doors, therefore Resolved, That the said copartnership or firm go into liquidation, and the better to effect that purpose that the president of said association, Cyrus Kitchen, Esq., be authorized and instructed to make a general assignment of all and every of the assets of said association or copartnership for the benefit of its creditors; and that Jas. W. Smith, Esq., be the assignee."

The assignee having filed a partial account, auditors were appointed to make distribution of the fund, and the case came before the court below on exceptions to their report.

It appears that there were three classes of depositors who claimed the right to participate in the distribution of the fund; (1) those who made deposits after August 2, 1893, when H. C. Beman transferred his ten shares of stock to Cyrus Kitchen; (2) those who made deposits prior to that date and after January 8, 1892, when Otto Stoltz purchased and had transferred to him five shares of stock; (3) those who made deposits prior to the last mentioned date.

The question we are called upon to decide is, who were the creditors of the Meadville Savings Bank at the time the resolution was passed and the deed of assignment made. We have the partnership agreement, the manner of conducting the business, and the resolution itself to guide us. The learned auditors adopted the view that the assigned estate "belonged to the last partnership, or the one which conducted the business from the time Cyrus Kitchen purchased the stock of H. C. Beman" and recommended distribution accordingly. We think this is the right conclusion, notwithstanding the able opinion of the learned judge of the court below to the contrary.

There are certain legal propositions concerning which there is and can be no dispute. We state them for the purpose only of narrowing the discussion to the vital and controlling question in the case. The general rule of law, in the absence of an agreement otherwise, is, that the retirement of one member or the admission of a new member works a dissolution of the partnership. If the retiring member sell his interest to the other members, or to a third person who is admitted as a member, and they continue the business, the creditors of the former firm have no equity attaching to the partnership effects of that firm

which have passed to the succeeding partnership. The new firm in such a case has absolute dominion over the property unhampered by any lien or trust in favor of the creditors of the former firm. They may sell it, or assign it for the benefit of creditors, and in that case the only persons entitled to participate in the distribution are the creditors of the firm to which the property belonged at the time of the assignment. The fact that the interests of the partners are represented by shares of stock which are transferable like shares in a corporation, and after such transfer the business is conducted as before, without separation or distinction made between past and future liabilities, does not change these rules. The stockholders in such a bank have the rights and responsibilities of, and in their relation to the public and each other are, general partners : Shamburg v. Abbott, 112 Pa. 6 ; Christy v. Sill, 131 Pa. 492. So also it is to be remembered that although the manner of doing business as described in the auditors' supplemental report is entitled to due weight in interpreting the articles of copartnership, yet, as they well say, the fact that the partnership succeeding in the business upon a transfer continued the business as it was formerly conducted and paid obligations contracted by the old firm, would not, of itself, bind them, for all such claims.

But while these rules govern ordinary partnerships, no rule of law forbids the partners to so frame their articles of copartnership as to change their rights and liabilities, and to deprive the retirement of an old partner and the introduction of a new one of many of the usual consequences of such action. Nor is any rule of public policy contravened by an agreement between the partners that a retiring partner shall not have the right to require a winding up of the business and an immediate payment of the debts out of the partnership assets, and that, in consideration of his surrendering that right, the firm as constituted after his retirement shall take all of the assets, continue the business as if no change of membership had taken place, and pay the debts. If this were the clear meaning of the articles of copartnership there would be much force in the reasoning of the learned judge whereby he reached the conclusion that the firm as constituted after the withdrawal of a member would be liable to the creditors for the debts, upon the principle recognized in Adams v. Kuehn, 119 Pa. 76, and Delp v. Brewing Co., 123 Pa. 42, and kindred cases.

Assuming the correctness of his premises, his conclusion, at least so far as it applies to the last change of the partnership when H. C. Beman dropped out, seems to have some support in the decision of the Supreme Court in Frow, Jacobs & Co.'s Estate, 73 Pa. 459. Forsman sold out his interest in a firm to the remaining members, who covenanted jointly and severally to pay the debts, and indemnify him against them ; the remaining members continued in the same business as a partnership, took all the firm's assets, and took upon themselves the debts without any division of Forsman's interest. Forsman paid debts of the first firm, and the second firm afterwards assigned for the benefit of creditors. On the distribution the auditor held that the covenant created only a joint and several obligation of the makers and not of the new firm as such ; therefore Forsman was not entitled to participate in the distribution as a firm creditor. On appeal the Supreme Court intimated that if the case depended solely on the covenant the conclusion of the auditor would have been correct. "But," said AGNEW, J., " Frow, Jacobs and Parker were already liable for these debts as partners in the firm of Forsman & Co. which they took upon themselves when Forsman retired from the firm, and they continued the business. The evidence is clear, that, when Forsman sold out his interest to his partners and retired, they proposed to continue the business, and did so. When he went out they took all the assets of the firm into the business and took upon themselves all the debts. There was no separation of Forsman's interest or share in either assets or debts. These assets became the capital of the new firm, and the debts, already partnership, as it regards them, became its debts. In short, it was but a dropping out of Forsman, leaving the other partners in all respects. . . . That these debts were assumed by the new firm is manifest from the nature of the business, the attending circumstances, the declared intention of the parties, their subsequent acts, and their interests." All this would be true of this case if the articles of copartnership are to be construed as contended for by the appellees. It would seem, therefore, that, upon a change of partnership by the dropping out of one member, the new firm may become liable for existing debts although the evidence may fall short of establishing a complete novation. And if, in the present case, by virtue of the articles of copart-

nership or otherwise, the new firm as such became liable to the creditors for the debts existing at the time of the change of membership, then, manifestly none of the partners at the time of the assignment had any equity which would entitle him to demand that the debts incurred afterwards should be first paid. The equities of the creditors must be worked out through the equities of the partners, and if none of the partners has an equity to have a preference made in the distribution then of course none of the creditors has any, and the distribution decreed by the court to all of the creditors of the Meadville Savings Bank without regard to changes in the membership of the partnership was right.

It will be observed, however, that in order to reach this conclusion, it is necessary to hold, in the first place, that the articles of copartnership contain such an agreement as we have referred to, and, in the second place, that it enured to the benefit of those who became creditors prior to the changes in the membership of the firm. Do the articles of copartnership contain an agreement which bound the new firm, created whenever a change of membership occurred, to pay past debts and to indemnify the retiring member against them? This is the pinch of the case. The solution of this question depends finally on the construction of that clause of the provision relative to the transfer of stock which reads: "and upon such transfer the assignee or assignees of such share or shares shall thereby, as to such share or shares, succeed and become subject to all the rights and obligations of an original party thereto." The ordinary rule is, that the purchaser of a partner's interest acquires no right to be admitted to the firm without the consent of the remaining partners, or to interfere in the partnership affairs. What he acquires is simply the seller's share of the assets after the partnership debts are paid. One purpose of the provision under consideration was to secure his admission into the new firm and to prevent a winding up of the business. It is questionable whether more was intended. An incoming partner may become liable for the debt of the old firm by agreement, but the presumption of law is against such liability and requires proof to remove it: Kountz v. Holthouse, 85 Pa. 235. Even if this were a new question, we should hesitate to say that this provision, standing by itself, could be construed as an agreement whereby a purchaser of a

share of stock would become liable to creditors for all of the past debts of the concern. And yet this is what we must hold to sustain the decree. The more reasonable and natural construction of the language is, that upon a transfer of stock the assignee acquired the rights and became subject to the obligations of a partner as fully as an original member of the firm or holder of stock—which is the same thing—acquired such rights and became subject to such obligations. But this is not a new question. After a careful comparison of these articles with those of the Pittsburg Savings Bank, which were construed in Christy v. Sill, 131 Pa. 477, we are of opinion that that decision rules this case. The manner of conducting the business of that bank was similar to that of the Meadville Savings Bank. The articles of copartnership with reference to the dissolution of the partnership and the transfer of stock were substantially the same as these; but in place of the provision under consideration was this: " All stockholders are hereby individually bound to make good to all depositors the amount of their deposits." If anything, that is a less ambiguous provision than this, and, as we have suggested, the related provisions and the manner of doing business, so far as they might be resorted to in aid of its construction, were very much the same as appear in the present case. But the court said—McCOLLUM, J., " We are unable to discover in the restrictions on the sale of stock any engagement by the incoming partner to become liable for the antecedent debts of the firm, and we cannot construe article 27 as imposing on him such a liability. If it had been the purpose of the partnership to attach such a result to a change of membership, it should have been clearly expressed. We think article 27 refers to deposits made with the firm of which the stockholder is a member, and that it has no application to deposits made with a preceding or subsequent firm. Thus read and understood, it is intelligible and in accord with well established principles."

For the same reasons we are compelled to the conclusion that the articles under consideration cannot be construed as binding the new firm, created when a change in membership took place, to pay the antecedent debts. They remained the debts of those who were members of the firm when they were incurred, and so far as we can see the persons composing the Meadville Sav-

ings Bank on August 2, 1893, are still liable to every depositor whose money they had received, unless the last partnership has heretofore paid the debt. The hardship which it is suggested is likely to result from not allowing them to participate in this distribution is more seeming than real. Every one who lends money to a partnership composed of a number of persons, whether the firm be organized for banking, manufacturing or other business is presumed to know that changes are likely to occur from time to time in the membership. He is bound to know the law, and there can be no presumption of law or fact that he will suffer if he is left to his remedy against those whom he trusted.

As the whole right of property existed in those who constituted the firm after the last assignment of stock, their right to appropriate it to the partnership debts of that firm is clear and unquestionable: Baker's Appeal, 21 Pa. 76.

The learned auditors have found that the legal effect of the resolution authorizing the assignment and the deed executed pursuant thereto was to vest the assets of the association in the hands of the assignee for the benefit of creditors of the partnership then existing, and which had its origin at the time of the transfer by Beman to Kitchen. This finding we think was correct. There is nothing in the circumstances attending the passage of the resolution or the making of the deed, nor in the writings themselves to justify any other conclusion. We must hold the assignment to have been intended for the benefit of those only who had, at the time it was made, a clear legal status as creditors of the firm which was the then owner of the assigned estate. It follows that the distribution recommended by the auditors is correct, except as to the claim of T. H. Apple. In the view taken of the main question by the learned judge it was not necessary to pass on his exceptions, hence they were not considered and no disposition was made of them. Not having been able to adopt his conclusion upon that question it now becomes necessary for us to consider these exceptions.

On August 2, 1893, when the last change in the partnership took place, T. H. Apple had a credit balance of $670.47. On December 1, 1893, his account was overdrawn $132.90. He made subsequent deposits so that on January 13, 1894, when the bank closed its doors, he had made good this overdraft and

had a balance in his favor of $790.30. The auditors say in regard to this and similar cases: " If by dealings on or after the last change of partnership interests, to wit: August 2, 1893, the claim of the creditors who held a credit balance in the bank at that time has been changed, they can only participate to an extent equal to the new credits created subsequently thereto, and all payments made after such change must be applied in discharge of such an indebtedness." Applying this rule to Mr. Apple's case they held that he was entitled to a dividend on $119.90, the difference between his credit balance on August 2, 1893 ($670.40), and his credit balance on January 13, 1894, ($790.30). The question is precisely the same as if, instead of having overdrawn his account on December 1, 1893, he had simply drawn out an amount which would exactly balance his account. Suppose that in that case he had subsequently deposited $790.30 and that that balance stood to his credit on the books of the bank when the bank closed, upon what theory could the payments made to him prior to December 1, 1893, be used to reduce his credit balance on January 13, 1894? Upon no theory, except that such payments were in the nature of overdrafts or loans, and that subsequent deposits were but repayments thereof. This is apparently the theory adopted by the auditors, but it is utterly inconsistent with the theory of the parties to the transaction as manifested by their unequivocal acts.

In their supplemental report the auditors say " that upon a transfer of stock or change in the partnership interests no new books were opened nor were the accounts between the partners settled; that the business was conducted as before and there was no separation or distinction made between past and future liabilities or assets on the occasion of any transfer, and that the assets or moneys of the bank were used in discharging old obligations or in making new loans, without any reference to the transfer of stock and without regard to the time when the liabilities so made were incurred;" . . . . When, therefore, the new partnership honored the depositor's checks against the balance which stood to his credit on August 2, 1893, or paid him in any other way, it was understood by the parties, not as a loan or an overdraft, but as a discharge pro tanto of his obligation against the bank. Assume that the new partnership

was not legally bound to pay the indebtedness due to depositors on August 2, 1893, yet if from politic motives, in order to retain the confidence of the public and to obtain new credits, they saw fit to assume or to pay it, they could not afterwards turn round and say that the payment was simply a loan or an overdraft which they were entitled to deduct from future deposits.   If, between August 2, 1893, and January 13, 1894, the payments to, and deposits of, the depositors were exactly equal the former would properly be applied to the new indebtedness and thus no new credit would be created.   If the credit balance on August 2, 1893, was at no time thereafter reduced, the extent of the new credit would be measured by the difference between the credit balance on that date and the final balance on January 13, 1894, and in such case the distribution report by the auditors is right.   But we think the appellees are clearly right in maintaining that where the credit balance on August 2, 1893, was reduced by subsequent payments there should be deducted from the final balance only the lowest balance to which the account was reduced after August 2, 1893, and the difference, representing as it does a new credit, should participate in the distribution.   By this rule Mr. Apple was entitled to a dividend on his entire credit balance of $790.30.   His first exception is sustained.   As he only has excepted upon this ground, schedule " A " as reported by the auditors will require but slight modification.

So much of the decree as dismisses the exceptions to the auditors' charge for compensation is affirmed.   The rest of the decree is reversed and the cause is remitted to the court below with directions to make distribution in accordance with the auditors' schedule A except as modified by the allowance of a dividend to T. H. Apple on his entire credit balance of $790.30. The costs of this appeal are directed to be paid out of the assigned estate.